FILED

07/07/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0539

DA 25-0539

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 146

THE ESTATE OF FLORENCE TOSCH,

     Plaintiff and Appellee,

  v.

EDWARD KAHLE and CATHERINE KAHLE,

     Defendants and Appellants.

APPEAL FROM:   District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DV-22-99
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

     For Appellants:

          Edward Kahle and Catherine Kahle, Self-Represented, Rexford, Montana

     For Appellee:

          Jeffrey D. Ellingson, Kaufman Vidal Hileman Ellingson, PC, Kalispell, Montana

Submitted on Briefs: May 6, 2026

Decided: July 7, 2026

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Appellants Edward Kahle and Catherine Kahle (Kahles) appeal from the June 26, 2025 Judgment entered in the Nineteenth Judicial District Court, Lincoln County, in favor of the Estate of Florence Tosch (Estate) for an amount of $331,121.40. The District Court concluded that the Kahles are liable to the Estate for damages under the Montana Residential Landlord Tenant Act (MRLTA); damages arising from fraud and deceit and slander of title; and a declarative judgment ruling a purported 2019 lease with option to purchase (2019 Lease/Option) is void ab initio. We affirm.

¶2 We restate the dispositive issues as follows:

1. *Whether by clear and convincing evidence the Estate established that the Kahles acted with actual fraud as defined under § 27-1-221, MCA.*

2. *Whether the Estate properly followed the MRLTA in its post-eviction dealings with the Kahles.*

3. *Whether the District Court correctly determined damages caused by the Kahles' forgery of the 2019 Lease/Option and slander of title.*

4. *Whether the District Court abused its discretion when awarding the Estate its attorney's fees.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Florence Tosch (Florence) was married to Jack McCafferty (Jack). The two owned a home outside of Trego, Montana, (Trego Property) as joint tenants with right of survivorship. Pursuant to Florence and Jack's 2015 divorce decree, Florence was given exclusive right to occupy the Trego Property; however, she was to list it for sale and distribute one-third of the net proceeds of the sale to Jack, who was obligated to assign his title interest to Florence. Florence had a shop on the Trego Property converted into an

2

apartment for herself in order to rent out the adjacent home. Florence had two daughters from a previous marriage, Korrie Foley (Korrie) and Kippie Collins (Kippie), who both lived out of state. Florence visited her daughters and their families for extended periods of time. Those visits became more frequent as Florence's cancer progressed. Florence bought an apartment in Phoenix, Arizona, which Korrie moved into in order to care for her mother in February 2021.

¶4 Florence entered into a one-year lease agreement (2017 Lease) with the Kahles for the home on the Trego Property beginning on June 1, 2017. The lease provided that the Kahles would pay $1,500 in monthly rent, were required to pay utilities, and would divide the electric bill with Florence. Pursuant to her standard practice with tenants leasing the house, Florence had both the Kahles initial each page and sign the written lease agreement. The 2017 Lease included an attorney's fees provision for damages resulting from the Kahles' breach of the lease. By its own terms, the lease expired at the end of May 2018 and by operation of law converted into a month-to-month lease. The Kahles continued to occupy the Trego Property until they vacated the premises on December 3, 2022, following a November 4, 2022 Order entered in the District Court granting the Estate possession of the Trego Property.[1]

¶5 By all accounts, Florence and the Kahles got along well with each other. Edward Kahle (Edward) made repairs and provided other labor on the Trego Property. Edward

---

[1] The parties have a separate pending appeal, which was classified for submission to a five-justice panel of this Court on December 24, 2025, and an Opinion in that matter is forthcoming. *Kahle v. Est. of Tosch*, No. DA 25-0538, Order (Mont. Dec. 24, 2025).

3

frequently communicated with Florence in person and by email. In an email to Florence dated January 10, 2021, Edward explained, "Cath[erine] mentioned to me her concern of being secure here and wanting to know if we should plan for just in case? I know you were working on making that possible. Should we be concerned and plan for just in case?" Florence responded that the Kahles were secure at the Trego Property for as long as she remained alive. On January 14, 2021, Edward followed up with:

> The only thing I worry about is work and having a secure house to live in. That's why I asked about being secure in this place. . . . I'm trying to see our future and plan accordingly if I possibly can so what you['re] saying is when you die we will be needing to find a new roof to be under? I guess I need to plan for that. Perhaps purchase some property here if we can find some to build on if needed?

Florence shared her hope with Korrie that the Kahles could continue to reside on the Trego Property after her passing. In a later email to Florence referring to what Jack and his daughter might do with the Trego Property upon Florence's passing, Edward explained:

> We mean nothing to them. I have no legal recourse to protect the roof over my family's heads. If Jack says out, then we have to go. . . . If your daughters decide to sell and we can't meet their price, we have to go. If your daughters or Jack decide to double the rent then we have to go. . . . Is there any recourse that will protect Cath[erine] and me to stay here all our days?

¶6 Florence died on May 11, 2021, in Korrie's home after being cared for by her daughters' families. During her lifetime, Florence worked as a real estate agent for several years, was a loan officer at a bank, and also prepared taxes. Florence was known to be detailed and organized in her dealings with her various rental properties. Before her death, Florence had updated her estate planning documents. According to her trust and pour-over will, Korrie was appointed as the personal representative to the Estate. Florence's trust

4

documents identify the Trego Property as a trust asset to be distributed in equal shares to Florence's children. The trust does not identify any other beneficiary.

¶7 In an extended email discussion from May 15 through June 4, 2021, Korrie and Edward discussed issues with settling the Estate, potential issues with Jack, who continued to have a title interest in the Trego Property, and Korrie and Kippie's upcoming visit to the Trego Property. Edward expressed anxiety over the uncertainty that his family would be permitted to remain on the Trego Property stating:

> It's hard now for us to be at peace wondering if our lives will all of a sudden change. We just don't feel secure anymore - again. Believe me this is not the situation I ever dreamed of being in - no control over my roof but am forced to because I willingly had to walk away from what I had planned to save for my family.

When asked if the Kahles had a copy of any kind of lease agreement they had with Florence, Edward responded that they "had a lease for the first year only. I asked her when she wanted to renew it and nothing? We all forgot about the lease." Edward also expressed his interest in potentially purchasing the Trego Property if it needed to be sold.

¶8 In July 2021 the Estate had the Trego Property appraised by a Montana Certified Residential Appraiser at $1,080,000. The record indicates that the high value of the Trego Property complicated the Estate's efforts to buy Jack out of his title interest. In early August 2021, Korrie explained to Edward that having a tenant complicated listing the Trego Property for sale, but that nothing was for certain since the property might remain on the market for an extended period of time and that a potential buyer may want to have tenants already residing in the property. The Kahles, however, obstructed the Estate's ability to have realtors inspect the Trego Property. Later, on August 16, 2021, the Estate's

5

attorney served the Kahles with a 30-day notice of termination of the month-to-month lease and Edward responded by email asking, "by what authority does the Florence Tosch Trust have to evict me when Jack McCafferty wants me here and holds Title to the property through survivorship?" Edward then contacted Jack and represented that Florence had entered into a 2019 Lease/Option with him and persuaded Jack to execute a Lease with Option to Purchase (2021 Lease/Option) the Trego Property. The Kahles recorded the 2021 Lease/Option with the Lincoln County Clerk and Recorder on August 26, 2021. The Kahles then retained local counsel who presented the Estate's attorney with a copy of the 2019 Lease/Option purportedly signed by Florence on September 7, 2019. The Estate deposed Edward in November 2021, who swore that the document was authentic. Although Korrie immediately doubted the authenticity of the 2019 Lease/Option, she was advised to complete due diligence before moving forward with the eviction as the Estate could be found liable for wrongful ouster of the Kahles.

¶9 The Estate served another 30-day notice on the Kahles on April 22, 2022, providing a May 31, 2022 move-out date. The Kahles did not vacate and on June 15, 2022, the Estate's attorney informed the Kahles that he returned their rent check since the month-to-month lease terminated on May 31, 2022. The Kahles then paid the $1,500 rent directly to the local mortgage servicer on two occasions. The Estate served the Kahles with a complaint for eviction on June 20, 2022. The District Court held a hearing on the complaint for possession on October 20, 2022.

¶10 At the hearing for possession, Korrie testified that she had a close relationship with Florence and communicated with her regularly regarding her mother's health and financial

6

affairs. Florence never mentioned the 2019 Lease/Option. Korrie assisted Florence with her end-of-life instructions which listed her various financial accounts and included a description of where to find the 2017 Lease with the Kahles. Korrie located the 2017 Lease exactly where it was described in her mother's end-of-life instructions. Korrie searched through her mother's files and other property but could not locate the 2019 Lease/Option. Korrie explained that her mother maintained meticulous records and followed strict protocols when executing documents based on her experience in finance and real estate. It was Florence's practice to have all adult residents leasing one of her real properties to sign the lease agreement and initial each page. Catherine Kahle (Catherine) did not sign the 2019 Lease/Option and Edward did not initial any of its pages. Korrie further testified that when she enlarged the signatures on the 2019 Lease/Option the pixels on the signatures did not match. Korrie was able to replicate a signature by copying and pasting an image onto a document with the aid of a software program and an online independent contractor, resulting in a similar discrepancy as the signatures on the 2019 Lease/Option. Korrie further explained that the price of the 2019 Lease/Option was $268,691 and that under the purported agreement all monthly rent payments since June 1, 2017, would be credited to the purchase price for a net price of $226,691. The principal on the mortgage for the Trego Property was $253,384 at the time, leaving a loss to Florence of $26,693.

¶11 James Green (Green), a Forensic Document Examiner with over 30 years of experience in the field, testified as an expert regarding the authenticity of the 2019 Lease/Option. Green explained that the issue of copying and pasting signatures is a growing problem due to technological advancements available to the general public. The

7

first concern that Green had with the 2019 Lease/Option was that it was a copy and not the original. When Green inspected the 2019 Lease/Option, he also noticed the difference in the resolution between the purported signatures and the rest of the document. Green concluded that the 2019 Lease/Option indicated a raster file, which is an image compiled using pixels, as well as a vector file, which uses a mathematical formula to plot an image and maintains the same quality when enlarged. Green attempted to replicate the discrepancy using dozens of different writing instruments to no avail and then reached out to professional print designers who explained that it was not possible for an authentic document to contain a blending of a raster file and a vector file. Green concluded that the signatures were a digital capture transported onto the 2019 Lease/Option document and that this document is not one that he would rely on as a Forensic Document Examiner. On cross-examination, Green explained that as a scientist he could not say that he had 100-percent certainty that the document was forged and that he would be open to new evidence if the original document was available.

¶12  The Kahles appeared at the hearing pro se. Edward testified that his family had a very good relationship with Florence and that he completed a significant number of improvements to the Trego Property. Edward testified that he produced the 2019 Lease/Option on his personal computer but no longer had a digital file because the computer stopped working even though he had access to documents created before September 2021. When questioned about how the terms of the 2019 Lease/Option would result in an outstanding balance on the mortgage he stated that he had a separate, unwritten agreement with Florence for the Kahles to pay off the remaining balance notwithstanding

8

the seller's obligation to produce clear, marketable title at sale. When questioned why he did not raise the 2019 Lease/Option in his email correspondence with Korrie shortly after Florence's death, Edward explained that he was confused about who held title to the Trego Property given Florence's death and Jack's joint tenancy in the property. He also testified that because Korrie specifically asked about a lease and not an option that he did not think to mention the purported 2019 Lease/Option. Edward suggested that Korrie may have destroyed the original 2019 Lease/Option and further alleged that Korrie exercised undue influence upon her mother when Florence revised her estate plan before her death. Finally, Edward testified that although email correspondence between him and Florence around September 7, 2019, made references to the Trego Property and a late rent payment, he and Florence discussed the 2019 Lease/Option in person and not by email. Florence was out of town on September 7, 2019, and stated in an email to Edward that she would not be back to the Trego Property until the following Wednesday.

¶13 The District Court granted the Estate possession of the Trego Property on November 4, 2022. The court reasoned that the statute of frauds requires any option and lease in excess of one year to be in writing and that the *copy* of the 2019 Lease/Option does not satisfy the best evidence rule because the Estate raised a genuine question as to its authenticity. The 2019 Lease/Option, therefore, was not admissible. The District Court concluded that the Estate had not only raised a genuine question as to the document's authenticity but also established by a preponderance of the evidence that Florence never signed the 2019 Lease/Option or any other agreement with the Kahles other than the 2017 Lease. Without the 2019 Lease/Option, the Kahles could not meet their burden of proving

9

a legal right to possession of the Trego Property. Anticipating potential issues with compliance with its Order, the District Court included a writ of possession if the Kahles did not vacate the Trego Property within 27 days after its Order.

¶14 Upon observing that the Kahles had made little effort to remove their personal property from the Trego Property, Korrie requested a civil standby on December 3, 2022. On that morning, Korrie emailed the Kahles an offer to move any remaining items to storage in Eureka, Montana, and to pay one month of storage rent. Korrie requested that the Kahles provide a list of items which they were particularly concerned with and where she could find them, along with photos, and that the Estate would prioritize removing those items into storage first. The Kahles responded to Korrie's email asserting that it was "completely unrealistic to expect anyone to remove all of a family's household belongings in 24 hours in the middle of winter." The Kahles suggested that, given the Kahles' pending motion for a stay before this Court, that the Kahles would remove what personal property they could by 4:00 p.m. that day and the remaining items would be "untouched and unmoved" until this Court decided the Kahles' motion for a stay. Finally, the Kahles asserted that if this Court ultimately sided with the Kahles that the Estate would "be responsible for any inconvenience, moving costs, legal costs and other costs associated with pre-emptively 'jumping the gun' of the decision of the Supreme Court of Montana." The Kahles did not provide any guidance for what property the Kahles intended to keep until February 11, 2023.

¶15 Korrie arrived at the Trego Property shortly after the Kahles vacated around 4:00 p.m. on December 3, 2022, to find a substantial amount of the Kahles' personal property

remaining. The Kahles failed to return the keys; left an ATV, canoes, bunk beds, three vehicles; and several pieces of household furniture outside the home in the snow. Once inside, Korrie observed that the home was filthy and grimy with cat litter and urine everywhere and piles of clothing. Nothing was organized or labeled. Korrie assessed that the personal property was abandoned due to its neglected condition. Korrie received an estimate of $6,500 to move all remaining personal property into storage and determined to mitigate the Estate's damages by storing the Kahles' personal property on the Trego Property. Korrie, her husband, and Kippie worked over three days to organize the Kahles' personal property and move it into the basement. On December 5, 2022, Korrie emailed the Kahles a link to § 70-24-430, MCA, and the text of the statute pasted into the body of the email, stating that she would follow the statutory procedure for personal property abandoned by a tenant after termination and gave the Kahles ten days to respond and then seven days to retrieve their personal property under the condition that the Kahles pay the Estate, by wire transfer, $4,125 for labor and storage costs. Korrie attached a spreadsheet showing how she calculated the labor and storage costs based on market research, $50 an hour for labor, and the total hours that her family worked to organize and store the Kahles' personal property in the basement, as well as a list of damages caused by the Kahles. Korrie also informed the Kahles that she had sent a hard copy of this email to general delivery at the Trego Post Office since the Kahles did not provide a forwarding address upon their departure.

¶16     The Kahles responded to Korrie's email on the last day of the ten-day deadline and informed her that she would be hearing from their attorney. The Estate negotiated with the

11

Kahles' attorney for a date and time for the Kahles to retrieve their personal property, and for a list of property that the Kahles intended to retrieve. The Kahles furnished an inventory of the property they claimed to own on February 11, 2023, which claimed a total of $263,797 worth of personal property.[2] For example, a broken grill that the Estate had hauled to the dump was listed as worth $500 and then later valued at $5,500, yet Edward claimed at trial to have a receipt for $269 for the grill. A homemade pine bookshelf was listed at $750 and then $7,500. The Kahles claimed that their book collection was worth $28,500. The Kahles claimed ownership of fruit trees planted on the Trego Property and other items belonging to the Estate.

¶17    The Estate retained Stephanie Miller (Miller), an Accredited Member of the International Society of Appraisers, to appraise the Kahles' personal property left at the Trego Property. Miller based her appraisal on pictures and descriptions of items of personal property and by comparing those items to similar items listed for sale on various websites such as eBay and Facebook Marketplace. Miller appraised the total value of the Kahles' personal property to be approximately $7,000 based on her market research.

¶18    The Kahles finally removed some of their remaining personal property on May 13, 2023, under terms negotiated by the parties' attorneys.[3] The Estate had earlier offered to let the Kahles remove all their remaining personal property upon payment of labor and

---

[2] The Estate did not request a valuation of the Kahles' personal property, only for a description and a time that the Kahles could retrieve their property upon payment of the Estate's labor and storage costs.

[3] The Kahles were represented by two different attorneys during the course of their negotiations with the Estate.

storage costs. Under the negotiated terms, since the Kahles did not pay the Estate for labor and storage costs the Estate retained itemized property appraised by Miller at approximately $3,000 in lieu of payment. Although the Kahles retrieved some of their personal property on May 13, 2023, several items remained on the Trego Property. The Kahles then alleged that the value of their remaining personal property after May 13, 2023, was approximately $100,000.

¶19 The District Court held a bench trial on August 29 and 30, 2024. Korrie testified as to the damages incurred by the Estate due to the Kahles' holdover of the Trego Property and forgery of the 2019 Lease/Option. Upon the Kahles' removal from the Trego Property, the Estate paid $300 to haul oil buckets, chicken wire, and a broken grill to the dump, disassemble and then discard a bed frame built into one of the rooms, and to make repairs to cabinets and an oven door; $600 to have the Trego Property rekeyed; $215 to tow an abandoned vehicle; and, $120 to dig up gardening posts at $20 an hour for six hours. Korrie further testified to the costs to the Estate in mortgage interest, taxes, and insurance premiums incurred between October 2021 through November 2022 when the Kahles occupied and clouded the title to the Trego Property under the auspices of the 2019 Lease/Option. Moreover, the Trego Property was appraised at $1,080,000 in July 2021 during a time of low interest rates and heightened market interest in remote Montana real estate, yet multiple offers had fallen through and the then-current listing for the Trego Property was $750,000. In addition, Korrie testified that the Estate could make $3,000-4,000 a month through short-term rental of the Trego Property. During the trial the

13

Estate declared that it no longer sought an award of punitive damages and was limiting its relief sought to compensatory damages, attorney's fees, and costs of suit.

¶20 Catherine testified that she deferred to Edward on the family's financial and legal affairs. The Kahles introduced two receipts for propane purchased for the Trego Property on October 27, 2022, and November 28, 2022, for a total of $731.25 and argued that they should be reimbursed for this expense since they were evicted shortly after refilling the propane. The Kahles similarly sought reimbursement for the rent they paid after the Estate terminated their lease. When questioned about the inflated values of the Kahles' personal property, Edward—who represented to the District Court that he was an Independent Insurance Claims Adjuster—explained that he had based the value solely on sentimental value and replacement costs, not on fair market value. When questioned about the value of a retail-bought desk lamp that was listed as worth $400 and then $4,400, Edward answered, "it would be forty -- I mean $400." Throughout its extended dealings with the Kahles, the Estate made several offers to the settle the dispute.

¶21 The District Court found the testimony of Korrie credible in all respects and the testimony of Edward to lack credibility in general. In particular, the court found that Edward lacked credibility with respect to the 2019 Lease/Option and the existence and valuation of the personal property that the Kahles left at the Trego Property after their eviction.[4] The District Court concluded that the Estate acted reasonably and lawfully with

---

[4] The District Court further concluded that Edward perjured himself in his November 2021 deposition, at the October 20, 2022 hearing for possession, and at trial by swearing that Florence had signed the 2019 Lease/Option.

14

respect to the Kahles' personal property which they abandoned at the Trego Property and with respect to the cleaning costs and damages assessed after the Kahles' eviction. Regarding Korrie's offer to store the Kahles' remaining property, the District Court found that Korrie reasonably did not anticipate the amount of property that the Kahles abandoned and reasoned that because the Kahles did not rely on the offer and continued attempting to remove all their personal property from the Trego Property, it was merely a gift proposal which the Kahles were not entitled to enforce as a contract. Regarding the Kahles' claim for reimbursement of propane, the District Court reasoned that the Kahles purchased the propane at their own volition and enjoyed the benefit of the propane while they remained at the Trego Property and their personal property enjoyed the benefit of the propane while it remained at the Trego Property. Furthermore, the Kahles did not provide any accounting of how much propane was on the Trego Property when they moved in the home in 2017 and how much was remaining when they vacated. Similarly, the Kahles also enjoyed the benefit of residing in the Trego home the two months they paid rent after the Estate terminated their lease.

¶22 The District Court determined that the Estate established overwhelming evidence, meeting the punitive damages standard of clear and convincing evidence, that Edward forged the 2019 Lease/Option with the intent to defraud and deceive the Estate into giving the Kahles the benefit of the 2019 Lease/Option at a great financial loss to the Estate. The District Court also concluded that the Estate established by clear and convincing evidence that the Kahles recorded the 2021 Lease/Option signed by Jack in order to cloud title to the Trego Property to prevent the Estate from selling the property to a third party or otherwise

15

negotiate unjust compensation from the Estate. The Estate acknowledged at trial that accrual of the damages from the cloud on the title halted on August 30, 2024, when the Kahles executed a quitclaim deed to the Estate. The District Court determined that after subtracting the Kahles' $1,200 security deposit, the Estate suffered $3,160 in uncompensated cleaning and damage repair costs related to the Kahles' tenancy of the Trego Property; $17,666 in compensatory damages from mortgage interest, insurance premiums, and taxes during the time the Kahles clouded title to the Trego property; and, $200,000 in lost opportunity costs to sell the Trego Property under more favorable market conditions. The District Court determined that the Estate was entitled to attorney's fees under the 2017 Lease, the MRLTA, and Montana's Uniform Declaratory Judgments Act from the date of the original complaint for eviction to the date of entry of judgment. Regarding the Kahles' personal property which still remained on the Trego Property, the District Court provided an itemized list identifying the property which the Kahles were entitled to possession of and provided a procedure for transferring such property from the Trego Property to the Kahles.

¶23 At the hearing on attorney's fees, the Estate produced an itemized time entry report substantiating the District Court's award of $109,324.50 in attorney's fees. The Kahles did not object to the Estate's time entry report and instead attempted to relitigate the arguments they made at trial and in the previous hearing for possession of the Trego Property.

16

**STANDARD OF REVIEW**

¶24 We review a trial court's findings of fact to determine whether they are clearly erroneous. *Cremer Rodeo Land & Livestock Co. v. McMullen*, 2023 MT 117, ¶ 14, 412 Mont. 471, 531 P.3d 566. We will affirm the findings of fact in a civil bench trial when they are supported by substantial credible evidence. *Cremer Rodeo Land & Livestock Co.*, ¶ 14. "We review such evidence in a light most favorable to the prevailing party, and leave the credibility of the witnesses and weight assigned to their testimony to the determination of the district court." *Cremer Rodeo Land & Livestock Co.*, ¶ 14 (quoting *Only a Mile, LLP v. State*, 2010 MT 99, ¶ 10, 356 Mont. 213, 233 P.3d 320).

¶25 This Court reviews a trial court's award of damages for an abuse of discretion. *DeTienne v. Sandrock*, 2018 MT 269, ¶ 10, 393 Mont. 249, 431 P.3d 12. "Proof of damages must consist of a reasonable basis for computation and the best evidence obtainable under the circumstances which enable a judge to arrive at a reasonably close estimate of the loss." *DeTienne*, ¶ 10 (quoting *In re Marriage of Mease*, 2004 MT 59, ¶ 42, 320 Mont. 229, 92 P.3d 1148).

¶26 We review a district court's conclusions of law and application of statutes for correctness. *Trifad Ent., Inc. v. Anderson*, 2001 MT 227, ¶ 27, 306 Mont. 499, 36 P.3d 363, *abrogated on other grounds by Salminen v. Morrison & Frampton, PLLP*, 2014 MT 323, 377 Mont. 244, 339 P.3d 602 (citation omitted).

¶27 We review for correctness a trial court's determination that legal authority exists to award attorney's fees. *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 15, 315 Mont. 210, 69 P.3d 663. Upon the proper conclusion that a trial court has the discretion to award

17

attorney's fee, this Court reviews such an award for an abuse of discretion. *Trs. of Ind. Univ.*, ¶ 15.

## DISCUSSION

¶28     *1. Whether by clear and convincing evidence the Estate established that the Kahles acted with actual fraud as defined under § 27-1-221, MCA.*

¶29     On appeal, the Kahles primarily take issue with the District Court's resolution of the parties' conflicting testimony. The Kahles also argue that the District Court failed to establish the nine elements of common law fraud to support the court's conclusion that the Kahles are liable to the Estate for compensatory damages. The Estate responds to the Kahles' arguments by reiterating the District Court's February 19, 2025 Findings of Fact and Conclusions of Law. Although the District Court did not award punitive damages under § 27-1-221, MCA, we will apply that analytical framework because that formed the basis for the District Court's award of compensatory damages. We note, in contrast to actual fraud under § 27-1-221, MCA, common law fraud requires the plaintiff to establish nine elements by a preponderance of the evidence and has a lesser burden than actual fraud under § 27-1-221, MCA. *See Folsom v. Mont. Pub. Emps. Ass'n, Inc.*, 2017 MT 204, ¶ 76, 388 Mont. 307, 400 P.3d 706 (Sandefur, J. specially concurring) (discussing the heightened burden of proof under § 27-1-221, MCA, compared to common law fraud).[5]  Moreover,

---

[5] A party asserting a claim of common law fraud must establish the following elements:
   (1) a representation; (2) the falsity of that representation; (3) the materiality of the representation; (4) the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance upon the truth of the representation; (8) the hearer's right to rely upon the

18

the actual fraud that occurred here was a forged instrument. Therefore, some discussion of forgery within the context of satisfying the elements of actual fraud is necessary.

¶30　　Section 27-1-221, MCA, statutorily defines actual fraud in non-contract disputes and provides for reasonable punitive damages when a defendant is found guilty of actual fraud. *Trifad Ent., Inc.*, ¶ 53. A defendant is guilty of actual fraud if the defendant (1) makes a representation with knowledge of its falsity or (2) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury. *Trifad Ent., Inc.*, ¶ 53; § 27-1-221(3), MCA. "Actual fraud is shown only when the plaintiff has a right to rely upon the representation of the defendant and suffers injury as a result of the reliance." *Trifad Ent., Inc.*, ¶ 53; § 27-1-221(4), MCA. Forgery, specifically, "is a false writing or alteration of an instrument." 36 Am. Jur. 2d *Forgery* § 11 (2026). The term "false" as applied to forgery "does not refer to the contents or tenor of the writing or to the facts stated therein, but implies that the paper or writing is not genuine, that it is in itself false or counterfeit." 36 Am. Jur. 2d *Forgery* § 11. "As a rule, to constitute forgery, the false writing must purport to be the writing of a party other than the one who makes it and it must indicate an attempted deception of similarity." 36 Am. Jur. 2d *Forgery* § 11. Although forgery is "a separate and graver offense" than making false pretenses because it "tends directly to destroy the security" of a written instrument, "the gist of forgery is still fraud." 32 Am. Jur. 2d *False Pretenses* § 5 (2026).

---

representation; and (9) the hearer's consequent and proximate injury or damages caused by their reliance on the representation.

*Morrow v. Bank of Am., N.A.*, 2014 MT 117, ¶ 57, 375 Mont. 38, 324 P.3d 1127 (citation omitted).

19

¶31 All elements of actual fraud under § 27-1-221, MCA, must be supported by clear and convincing evidence. *Trifad Ent., Inc.*, ¶ 54; § 27-1-221(6), MCA. "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Trifad Ent., Inc.*, ¶ 54 (citing § 27-1-221(5), MCA, (now § 27-1-221(6), MCA)). Clear and convincing evidence "is more than a preponderance of evidence but less than beyond a reasonable doubt." Section 27-1-221(6), MCA.

¶32 Here, upon a review of the record, we conclude the District Court correctly held that the conduct of Edward met the clear and convincing standard of proof for actual fraud regarding the 2019 Lease/Option and his conduct with the Estate. Edward made several statements that were inconsistent with the existence of the 2019 Lease/Option before his attorney presented it to the Estate in September 2021. For example, he sent two emails to Florence expressing his anxiety that his family would not be secure at the Trego Property upon her death and later emailed Korrie and asked, "Is there any recourse that will protect Cath[erine] and me to stay here all our days?" When the Estate terminated the Kahles' month-to-month lease, Edward asserted that because Jack was the surviving joint tenant to the Trego Property the Estate lacked legal authority to terminate the Kahles' lease. Furthermore, the District Court heard testimony which it deemed credible that Korrie and Florence communicated regularly about Florence's financial affairs; Florence never mentioned the 2019 Lease/Option; no record of the 2019 Lease/Option could be located among Florence's files; and, in contrast, the 2017 Lease was located exactly where Florence said it was stored. The terms of the 2019 Lease/Option also would have caused

20

Florence a significant financial loss, which was inconsistent with her prudent management of her finances during her lifetime. Catherine did not sign the 2019 Lease/Option, which was also inconsistent with Florence's protocol when entering into similar contracts. Florence's estate planning documents describe the Trego Property, name her two daughters as beneficiaries, and make no mention of the Kahles. Examiner Green provided persuasive expert testimony that the 2019 Lease/Option was a forged document because it was a copy with an unavailable original and it contained two different file types which is not possible in an authentic document. Edward's attempts to explain the suspicious circumstances surrounding the 2019 Lease/Option were unconvincing to the District Court and are unconvincing to this Court. The record supports the District Court's conclusion that there was clear and convincing evidence that Florence never signed the 2019 Lease/Option, despite a likeness of her signature appearing on the document. The 2019 Lease/Option is a forged document and therefore a false representation that the Kahles had a legal option to purchase the Trego Property.

¶33 Edward made a false representation that the 2019 Lease/Option was an authentic document when his attorney presented the Estate with it in September 2021. Edward made a further false representation as to the authenticity of the 2019 Lease/Option when he persuaded Jack to sign the 2021 Lease/Option and then filed that document with the Lincoln County Clerk and Recorder. Edward made similar false representations as to the authenticity of the 2019 Lease/Option in his November 2021 deposition and before the District Court. Edward knew the 2019 Lease/Option was false because he made several statements to Florence, Korrie, and the Estate's attorney which were inconsistent with the

21

document's authenticity concerning his legal right to continue living at the Trego Property after Florence's death. The record bears clear and convincing evidence that Edward knowingly made false statements that the Kahles had a legal option to purchase the Trego Property.

¶34 Because the 2019 Lease/Option purportedly vested Edward with legal rights to the Trego Property, the Estate justifiably relied upon it pending its investigation of the document's authenticity. Had the Estate not investigated the document's authenticity before taking legal action it reasonably may have incurred liability for wrongful eviction of the Kahles. Once the Estate completed its investigation, with the aid of Examiner Green, it continued to pursue a legal remedy to remove the Kahles from the Trego Property so that it could be sold and the Estate could then fulfill its obligation to distribute one-third of the net proceeds from the sale to Jack. The Kahles, however, continued to make false representations that they had a valid option to purchase the Trego Property throughout the proceedings before the District Court. The Estate suffered injury as a result of its justified reliance on the 2019 Lease/Option and then the recorded 2021 Lease/Option because it forestalled the ability of the Estate to sell the Trego Property or rent the property out at a higher rate through short-term rentals, and forced the Estate into protracted litigation from June 2022 until entry of the District Court's Judgment on June 26, 2025. These facts taken together overwhelmingly establish Edward committed actual fraud, thus meeting the statutory threshold of clear and convincing evidence.

¶35 Accordingly, the District Court properly concluded that the Estate established by clear and convincing evidence that the Kahles engaged in actual fraud regarding the 2019

Lease/Option and their representations to the Estate that they had a legal option to purchase the Trego Property at a financial detriment to the Estate.

¶36    *2. Whether the Estate properly followed the MRLTA in its post-eviction dealings with the Kahles.*

¶37    The MRLTA governs the legal relationship between residential tenants and landlords. Section 70-24-101, MCA. We interpret statutes in accordance with their plain meaning. *Kahl, Tr. for Frank L. Kahl, Revocable Tr. v. Polkow*, 2024 MT 248, ¶ 21, 418 Mont. 408, 558 P.3d 313 (*Kahl*). Where the statute's language is clear and unambiguous, the statute speaks for itself and no further interpretation is necessary. *Kahl*, ¶ 21. "If the landlord and tenant fail to establish a default extension period for the lease in the rental agreement and neither party gives a 30-day written notice to the other to terminate the tenancy before the rental agreement's original termination date, the tenancy continues on a month-to-month basis." Section 70-24-205, MCA. "If the rental agreement is terminated, the landlord has a claim for possession, rent, and actual damages for any breach of the rental agreement." Section 70-24-427, MCA. A landlord may deduct from a tenant's security deposit "a sum for actual cleaning expenses, including reasonable charge for the landlord's labor." Section 70-25-201, MCA. The MRLTA imposes a duty to mitigate damages. *Summers v. Crestview Apartments*, 2010 MT 164, ¶ 25, 357 Mont. 123, 236 P.3d 586 (citing § 70-24-401(1), MCA).

¶38    Section 70-24-430, MCA, provides the statutory process for disposing of a tenant's property after termination of a rental agreement. Where a tenancy terminates by court order, "the personal property is considered abandoned and the landlord may immediately

23

dispose of the personal property as allowed by law." Section 70-24-430(1), MCA. A landlord has a duty to "inventory and store all abandoned personal property of the tenant that the landlord reasonably believes is valuable in a place of safekeeping and shall exercise reasonable care for the property" and "may charge a reasonable storage and labor charge if the property is stored by the landlord, plus the cost of removal of the property to the place of storage." Section 70-24-430(2), MCA. The landlord must then make a reasonable effort to notify the tenant in writing that the property must be removed to a place of safekeeping and that if it is not removed by a specified time, not less than ten days after sending the notice, the property will be disposed of if not removed. Section 70-24-430(3), MCA. When a tenant responds in writing to the landlord on or before the day specified in the notice that the tenant intends to remove the property and fails to do so within seven days after delivery of the tenant's response, "the tenant's property whether of value or not is conclusively presumed to be abandoned." Section 70-24-430(5), MCA.

¶39 Here, the 2017 Lease automatically converted into a month-to-month lease pursuant to § 70-24-205, MCA, upon its termination date. The Estate served the Kahles on April 22, 2022, with a notice that their month-to-month lease would terminate on May 31, 2022. Upon the Kahles' failure to vacate the Trego Property by the termination date, the Estate obtained a claim for possession and actual damages for any breach of the 2017 Lease.[6] The

---

[6] The Kahles contend that because they continued to pay rent after their month-to-month lease terminated that the Estate waived its claim for possession. This argument might be persuasive if the Estate terminated the lease for a failure to pay rent but is unavailing in the context of a 30-day no-cause termination of a month-to-month lease. The Estate reasonably returned rent to the Kahles and then the Kahles endeavored to discover the mortgage servicer of the Trego Property and make payments directly to that institution thereafter.

Estate reasonably did not anticipate that the Kahles would leave behind such a significant amount of personal property when Korrie emailed her offer on December 3, 2022, to store the Kahles' remaining property given that they had been given 27 days to vacate. The Kahles responded to this gift offer by stating that it was "completely unrealistic to expect to remove all of a family's household belongings in 24 hours," invoked the authority of this Court, and then threatened legal consequences if the Estate "jumped the gun" and did not agree to their counteroffer. The Kahles assert that they formed a unilateral contract with the Estate to store their property at the Trego Property. "A valid contract requires the mutual assent of the parties on all essential terms." *Bucy v. Edward Jones & Co., L.P.*, 2019 MT 173, ¶ 20, 396 Mont. 408, 445 P.3d 812. The Kahles' response to the Estate on December 3, 2022, and their conduct thereafter in no way resembled acceptance of the formation of a contract. The Kahles responded to the December 3, 2022 email with a counteroffer that they should be allowed to keep their personal property at the Trego Property until this Court resolved their pending appeal. Then, as the Kahles testified, the Kahles did not rely on Korrie's gift offer and instead endeavored to remove as much of their personal property as possible from the Trego Property by their deadline to vacate. Furthermore, the Estate received no consideration for its offer to store the Kahles' remaining personal property and instead was further burdened by the continued presence of the Kahles' personal property on the Trego Property. *Bucy*, ¶ 20 (consideration is an essential element of a valid and enforceable contract).

¶40 Once Korrie discovered the actual extent of the personal property left behind by the Kahles, she reasonably mitigated the Estate's damages by storing it at the Trego Property.

She then emailed the Kahles on behalf of the Estate outlining the statutory procedure for property abandoned by a tenant after termination and asked the Kahles to provide a description of their remaining property within ten days. Korrie attached a spreadsheet substantiating her calculation of $4,125 for reasonable labor and storage costs and provided a list of damages caused by the Kahles. The Kahles responded on the last day of the ten-day deadline indicating that the Estate would need to negotiate the retrieval of their personal property through the Kahles' attorney and further protracted the process by providing a list of claimed personal property that included items clearly belonging to the Estate with grossly inflated monetary values admittedly based on purely subjective value. The Kahles only retrieved some of their abandoned property on May 13, 2023. The Kahles argue that they have a claim for conversion against the Estate for its handling of their personal property. However, because the Kahles failed to remove their personal property by the deadline under § 70-24-430, MCA, their personal property was statutorily abandoned by law, and the Estate had no duty to return the Kahles' personal property which remained at the Trego Property. The Estate and the District Court exercised considerable flexibility in permitting the Kahles to retrieve their personal property which they abandoned at the Trego Property.

¶41 The Estate provided credible testimony and a demonstrative exhibit that it incurred $3,125 in reasonable labor costs organizing and storing the Kahles' personal property. Similarly, the Estate substantiated its claim to $1,235 in damages caused by the Kahles' failure to return the keys to the Trego Property; payments to remove oil buckets, chicken wire, fencing and garden posts, an abandoned vehicle; and to make repairs to a cabinet and

26

an oven door. The Kahles did not offer any evidence to contradict the Estate's evidence and instead attempted to leverage the grossly inflated value of their personal property to offset the Estate's damages.[7] The District Court properly credited the Kahles' security deposit of $1,200 towards these damages to find a total of $3,160 in uncompensated cleaning and repair costs. Regarding the propane which the Kahles purchased shortly before their eviction, we agree with the District Court that the Kahles purchased the propane by their own volition, failed to show how much propane was on the Trego Property when they moved in and how much remained after they vacated, and that their personal property benefited by the Estate's use of the propane.

¶42    Accordingly, the Estate properly followed the MRLTA throughout the extended eviction process involving the Kahles and provided substantial credible evidence in support of the District Court's award of damages related to cleaning and repair costs.

¶43    *3. Whether the District Court correctly determined damages caused by the Kahles' forgery of the 2019 Lease/Option and slander of title.*

¶44    The Kahles essentially take issue with the legality of their eviction from the Trego Property and argue that because the Estate delayed evicting the Kahles after being presented with the 2019 Lease/Option it is the Estate which caused its damages. Because the Estate lawfully evicted the Kahles, as discussed above, this argument is wholly without merit.

---

[7] Much of the Kahles' argument on appeal hinges on reweighing the evidence before the District Court. "We do not reweigh the evidence presented nor do we judge the credibility of the witnesses, nor do we review evidence to determine if it supports a different decision than that reached by the court." *Cremer Rodeo Land & Livestock Co.*, ¶ 42 (quoting *Only A Mile, LLP*, ¶ 12).

¶45 "Every person who suffers detriment from the unlawful act of another may recover damages." *H-D Irrigating, Inc. v. Kimble Props., Inc.*, 2000 MT 212, ¶ 49, 301 Mont. 34, 8 P.3d 95 (citing § 27-1-202, MCA). An unlawful act must be the cause of the detriment suffered. *H-D Irrigating, Inc.*, ¶ 49. "The measure of compensatory damages for a tort is the amount for all the detriment proximately caused by the defendant's conduct, whether it could have been anticipated or not." *DeTienne*, ¶ 14 (citing § 27-1-317, MCA). "Detriment is a loss or harm suffered in person or property." *H-D Irrigating, Inc.*, ¶ 49 (quoting § 27-1-201, MCA). In the context of a trespass to real property we have said, "[t]he difference between the value of the property before and after the injury, or the diminution in value, generally constitutes the appropriate measure of damages." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 30, 338 Mont. 259, 165 P.3d 1079. The "injured party is to be made as nearly whole as possible—but not to realize a profit. Compensatory damages are designed to compensate the injured party for actual loss or injury—no more, no less." *Sunburst Sch. Dist. No. 2.*, ¶ 40 (quoting *Burk Ranches, Inc. v. State*, 242 Mont. 300, 307, 790 P.2d 443, 447 (1990)). A trial court's award of damages must be supported by substantial evidence and not speculative, "but mathematical precision is not required." *DeTienne*, ¶ 14.

¶46 Here, the record shows substantial evidence supporting the District Court's award of damages for slander of title. Edward's unlawful act of forging the 2019 Lease/Option and then clouding the title to the Trego Property prevented the Estate from selling the Trego Property throughout this protracted proceeding. The Trego Property was appraised at $1,080,000 in July 2021, but by August 2024 the Estate had received no offers above

28

$750,000, resulting in a minimum of $200,000 in damages for lost opportunity to sell the Trego Property under more favorable market conditions. The Estate also suffered 14 months of additional wear and tear to the Trego Property and incurred $17,666 from insurance premiums, property taxes, and mortgage interest that it would not have incurred had the Kahles not asserted that the 2019 Lease/Option was an authentic document vesting Edward with an option to purchase the property. The Kahles' continued occupation of the Trego Property under the deception of the 2019 Lease/Option similarly prevented the Estate from leasing out the property at its fair market value when the Kahles' monthly rent remained unchanged since 2017 at $1,500 per month. The Estate offered testimony that it could make $3,000-4,000 a month from the Trego Property as a short-term rental. The Kahles failed to rebut the Estate's evidence on its damages calculations and instead attempted to recast themselves as the victims.

¶47 Accordingly, there was substantial evidence in support of the District Court's award of damages caused by the Kahles' forgery of the 2019 Lease/Option and slander of title by recording the 2021 Lease/Option.

¶48 *4. Whether the District Court abused its discretion when awarding the Estate its attorney's fees.*

¶49 Montana applies the general American Rule that a party in a civil action is not entitled to attorney's fees absent a specific contractual or statutory provision or equitable exception. *Trs. of Ind. Univ.*, ¶ 19. Section 70-24-442, MCA, provides: "In an action on a rental agreement or arising under this chapter, reasonable attorney fees, together with costs and necessary disbursements, may be awarded to the prevailing party notwithstanding

29

an agreement to the contrary." An award of attorney's fees under this statute is discretionary. *Benintendi v. Hein*, 2011 MT 298, ¶ 24, 363 Mont. 32, 265 P.3d 1239. The Uniform Declaratory Judgments Act provides that additional "relief based on a declaratory judgment or decree may be granted whenever necessary or proper." Section 27-8-313, MCA. In *Trustees of Indiana University*, we quoted the Ohio Court of Appeals at length regarding an award of attorney's fees in a declaratory judgement action to provide guidance to future applications of § 27-8-313, MCA. *Trs. of Ind. Univ.*, ¶¶ 44-45 (citing *McConnell v. Hunt Sports Enters.*, 725 N.E.2d 1193, 1225 (Ohio Ct. App. 1999)). In *McConnell*, the Ohio Court of Appeals discussed its jurisprudence regarding attorney's fees in declaratory judgment actions and explained:

> In *Brandenburg* and *Culberson*, the bases for finding attorney fees were necessary or proper lay in the fact that without a declaration, the insureds in *Brandenburg* would not have coverage under their insurance policy and the plaintiffs in *Culberson* would have a cloud on their title. In those cases, the insurance company and the mortgagee essentially "possessed" what the insureds and plaintiffs sought in the litigation. Therefore, the insureds and plaintiffs in *Brandenburg* and *Culberson* needed a declaration that they were entitled to such "property" (in *Brandenburg*, the insureds sought, as a practical matter, $2,000 and in *Culberson*, the plaintiffs sought to lift the cloud from their title). In short, the declarations sought in those cases were necessary in order to change the status quo. Attorney fees expended in acquiring such declarations were necessary or proper to afford meaningful relief.

*Trs. of Ind. Univ.*, ¶ 45 (quoting *McConnell*, 725 N.E.2d at 1225). Thus, we have previously indicated an award of attorney's fees may be necessary or proper in a declaratory action brought to clear a clouded title to real property.

¶50 Here, the Kahles refused to vacate the Trego Property when they were first served with a notice of termination of their lease in August 2021. In response, the Kahles resorted

30

to forging the 2019 Lease/Option, persuading Jack to sign the 2021 Lease/Option, and then recorded this document to cloud title to the Trego Property in order to preserve the status quo. The Estate reasonably conducted due diligence with the assistance of its attorney to confirm that the authenticity of the 2019 Lease/Option was highly questionable. Once the Estate was reasonably reassured that it could move forward, it served another notice of termination upon the Kahles who failed to vacate by the notice period. The Estate filed its complaint for possession in June 2022 and appeared at the hearing for possession of the Trego Property represented by its attorney. After the Kahles' eviction, the Kahles further protracted the eviction process by refusing to provide a description of their personal property and potential dates to retrieve their property and instead used that opportunity to make unreasonable claims to property clearly belonging to the Estate and grossly inflating the value of their abandoned property. The Kahles removed some of their abandoned property on May 13, 2023. The Kahles' unreasonable and deceptive course of conduct throughout the eviction process necessitated the expenditure of significant attorney's fees by the Estate. Accordingly, the District Court did not abuse its discretion in awarding attorney's fees under the MRLTA to the Estate for its efforts to lawfully evict the Kahles from the Trego Property.

¶51 The record before us falls squarely within the circumstances contemplated by *Trustees of Indiana University* concerning a district court's discretion to award attorney's fees under § 27-8-313, MCA. Edward deceived the Estate and clouded title to the Trego Property under the fraudulent 2019 Lease/Option. The Estate reasonably investigated the Kahles' legal claim to the Trego Property and offered to settle the dispute with the Kahles

31

on multiple occasions under terms favorable to the Kahles. The Kahles clouded title to the Trego Property for three years and only signed a quitclaim deed disavowing any legal claim to the Trego Property well into trial on August 30, 2024. Because of the Kahles' deception under the 2019 Lease/Option, the Estate necessarily incurred substantial, yet reasonable attorney's fees to change an unjust status quo. Accordingly, the District Court properly determined that it had the legal authority pursuant to § 27-8-313, MCA, and did not abuse its discretion in its award of the Estate's attorney's fees.

## CONCLUSION

¶52 The Estate established by clear and convincing evidence that the Kahles engaged in actual fraud under § 27-1-221, MCA, when the Kahles forged the 2019 Lease/Option and recorded the 2021 Lease/Option and represented to the Estate that Edward possessed an option to purchase the Trego Property. The Estate lawfully observed the MRLTA throughout the eviction process and the return of the Kahles' abandoned personal property. The District Court heard substantial evidence in support of the Estate's damages and did not abuse its discretion in its award of compensatory damages to the Estate. Finally, the District Court properly concluded it had the legal authority to award the Estate attorney's fees and did not abuse its discretion in its award of attorney's fees.

¶53 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ JIM RICE

32